IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                NO. 17-CR-00370 JCH

IMAD AYSHEH, aka: "IMAD MANASSRA",
IYAD AYSHEH, NEDAL AYSHEH and RAED AYSHEH,

        Defendants.

## DEFENDANTS' JOINT MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29

COME NOW Defendants, by and through their respective counsel of record, and hereby move for judgment of acquittal pursuant to Rule 29. The United States has presented all of its witnesses and evidence, and it has failed to make a prima facie showing that the charged crime-conspiracy in violation of 18 U.S.C. § 371, occurred.[1] For the reasons stated below, the Defendants assert that they are entitled to judgment of acquittal.

I.        INTRODUCTION.

Under Federal Rule of Criminal Procedure 29(a), the court on a defendant's motion at the close of evidence must enter a judgment of acquittal for any charged crime for which the evidence is insufficient to sustain a conviction. Fed. R. Crim. P. 29(a). It has been established as a constitutional imperative that the government bears the burden to prove every element of a criminal charge beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 362 (1970). This requirement, applied through the rules of evidence consistent with that standard, "are historically grounded

---

[1] Defendants incorporate by reference and hereby preserve the arguments presented in their motion to dismiss (Doc. 254).

rights of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property." *Id.* (quoting *Davis v. United States*, 160 U.S. 469, 488 (1895)).

Although the jury's decision is afforded great deference, "the evidence, when viewed in its entirety, must generate more than a mere suspicion of guilt, and where such evidence is equally consistent with both guilt and innocence the conviction cannot be sustained." *United States v. Weidner*, 437 F.3d 1023, 1032 (10th Cir. 2006) (quoting *United States v. Fox*, 902 F.2d 1508, 1513-14 (10th Cir. 1990)). In reaching a conviction, juries have "wide latitude to determine factual issues and to draw reasonable inferences from circumstantial evidence," but inferences are reasonable only when "with experience serving as the touchstone[,] . . . there is a reasonable probability that the conclusion flows from the facts in evidence." *United States v. Summers*, 414 F.3d 1287, 1295 (10th Cir. 2005) (internal citation omitted). Where an inference relates to an ultimate conclusion underpinning criminal liability, "a jury may draw [the] inference only where that inference can be made beyond a reasonable doubt." *Id.* at 1295 n.4 (quoting *United States v. Rahseparian*, 231 F.3d 1257, 1264 (10th Cir. 2000)). The Court's duty is to "determine whether the evidence, if believed, would establishh each element of the crime." *United States v. Vallos*, 238 F.3d 1242, 1247 (10th Cir. 2001) (quoting *United States v. Evans*, 42 F.3d 586, 589 (10th Cir. 1994)).

**II.     ARGUMENT.**

To find a defendant guilty of violating 18 U.S.C. § 371, the jury must be convinced that the government has proved each of the following beyond a reasonable doubt:

First: the defendant agreed with at least one other person to violate the law.

Second: one of the conspirators engaged in at least one overt act furthering the conspiracy's objective.

Third: the defendant knew the essential objective of the conspiracy.

Fourth: the defendant knowingly and voluntarily participated in the conspiracy.

Fifth: there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. It is a kind of "partnership in criminal purposes" in which each member becomes the agent or partner of every other member.

*See* 10th Cir. Pattern Jury Instructions 2.19, 2.89.

At trial, the United States put on evidence of the following:

- Defendant Imad Aysheh organized a manufacturing business in the Philippines geared towards the production of inlaid silver jewelry, including Indian style jewelry, referred to throughout the case as IJ.
- Connected with IJ was a wholesale business set up by Defendant Iyad Aysheh, known as I Jewelers Wholesale, Inc.
- Some of the patterns in the jewelry manufactured by IJ were based on or inspired by the designs of Calvin Begay and Clayton Tom.
- IJ produced jewelry that was marked with the initials "IJ" and "Sterling," but with no reference to the country of origin.
- IJ jewelry was delivered to various retailers and wholesalers.
- Some retailers represented IJ pieces as Indian made or as made by a particular Indian artist, whether real or fictitious.

- Nedal Aysheh spent multiple months in the Philippines training a local manager and generally managing the IJ manufacturing facility.

- At some point, Nedal Aysheh sent pictures of and promised to deliver a small number of pieces of IJ Jewelry to Raed Aysheh.

- Raed sold IJ Jewelry to undercover Fish and Wildlife Agents and answered questions affirming the pieces were made in the Southwest by an Indian artist.

- Dr. Shapira purchased Native American made jewelry from Iyad Aysheh in 2013 when he was working at a different store. Those purchases are undisputedly not part of the allegations in this case and were made prior to Imad's Jewelry and I Jewelers Wholesale formation. That jewelry previously sold to Dr. Shapira by Iyad Aysheh prior to October 2013 was stolen in an unrelated burglary. In 2015, Dr. Shapira contacted Raed Aysheh and his business, Golden Bear, to purchase more jewelry. Raed Aysheh sent him pictures over text message of various pieces of jewelry to choose from, and Dr. Shapira selected items to purchase from Raed. There were no representations that any piece was made by a specific Native American artist or tribe in those text messages or otherwise.

- Cherry Padica worked at Imad's Jewelry in the Philippians and confirmed that there were no conversations about needing to mark jewelry with a country of origin, that she was unaware of that, and that the only letters ever marked were "IJ" for the name of the business.

Where the government falls short is on evidence of any agreement to violate the law. The United States put on no evidence that any Defendant agreed to violate importation laws. Indeed, the United States failed to put on a single piece of evidence tending to show that any of the Defendants knew about the regulation requiring country of origin marking. *See* 19 C.F.R. §

134.43.  Lacking in any evidence of an agreement, the United States submits that the jury may simply infer the agreement because of the lawful activities related to the business that were in evidence. The Government's logic is something like the following: (i) Imad Aysheh started the manufacturing company and ran it for a period of time; (ii) Nedal Aysheh helped manage the manufacturing company for a few months; (iii) Iyad Aysheh established a wholesale company which operated in an integrated fashion with the manufacturing company;  (iv) these brothers knew, so the logic goes, that the jewelry was required to carry a country-of-origin marking, and their failure to so mark the jewelry was *therefore* evidence of both an agreement to violate the importation regulation and to mislead the public.  Having failed to put on any evidence of knowledge of the regulatory marking requirement, the logic does not progress beyond that the brothers manufactured jewelry overseas and imported it into the United States without country-of-origin marking.  Without evidence that the brothers knew of the marking requirement, the failure to mark is not evidence that the brothers "agreed" either to violate the regulation or to mislead the public in violation of the Indian Arts and Crafts Act. Having instead put on evidence of a transparent, otherwise lawful importation business, the Government has failed to put on sufficient evidence that would allow a jury to find the requisite "agreement" to violate the law related to the importation regulation.

The Court is aware of the decision issued in *United States v. Sterling Islands*, holding that, "[b]ecause Congress did not qualify 18 U.S.C. § 545's 'contrary to law' provision, its plain meaning indicates that all agency-promulgated regulations fall within its ambit, including 19 C.F.R. § 134.43. 18 U.S.C. § 545." *United States v. Sterling Islands, Inc.*, 391 F. Supp. 3d 1027, 1056 (D.N.M. 2019).  Defendants affirmatively assert that this analysis from *Sterling Islands* is

incorrect, and that violation of the regulation at issue, which is not a criminal regulation, cannot support a violation of 18 U.S.C. § 545. The rule of lenity supports this position.

Nevertheless, even if the Court interprets 18 U.S.C. § 545 as Judge Browning did in *Sterling* Islands, the Court must recognize that there is a scienter requirement for 18 U.S.C. § 371, and that this conspiracy statute requires an agreement to engage in an unlawful act. At trial in this case, evidence of such an agreement never materialized. Ignorance of the requirement to add country of origin marking is therefore a defense. Failure of the United States to put on any evidence, much less evidence giving rise to a finding of guilt beyond a reasonable doubt, regarding the Defendants' knowledge of the requirement or any agreement to violate that requirement means that an agreement to violate the regulation regarding country of origin marking cannot properly form the basis of a jury verdict of guilt.

Similarly, the Government has failed to put on evidence that the defendants agreed to violate the Indian Arts and Crafts Act, which makes it "unlawful to offer or display for sale or sell any good, with or without a Government trademark, in a manner that falsely suggests it is Indian produced, an Indian product, or the product of a particular Indian or Indian tribe or Indian arts and crafts organization, resident within the United States." 18 U.S.C. § 1159. Here, the Government logic is: (i) Raed Aysheh made statements to an undercover agent that a piece of IJ jewelry was an Indian product, (ii) Ray is a brother to the other three Defendants; (iii) the other three Defendants had some role in manufacturing and/or importing the piece of IJ jewelry; and (iv) a conspiracy therefore occurred. The Government attempts to bolster its argument by putting on evidence that some other retailers which are not controlled by or affiliated with the Defendants misrepresented one or more of the pieces of IJ jewelry. The Government, however, failed to introduce any evidence that the brothers discussed marketing IJ Jewelry products in any fashion whatsoever.

Despite paring through thousands of emails, social media posts, texts, and other communications between the brothers, the United States found and therefore presented nothing related to a scheme or agreement about how to represent or market the jewelry. There is no testimony and no documentary evidence that Imad, Iyad, or Nedal knew or agreed to the manner in which Raed, or any other retailer, would present IJ Jewelry products. Indeed, the dissimilar ways in which the selected retailers represented the jewelry—as made by different artists (some of whom had initials other than IJ), as made by members of different tribes (Navajo or Zuni), and as made in different places (Albuquerque or Gallup)—evinces the lack of any such an agreement.

The mere fact that Imad's Jewelry produced Indian-style jewelry and I Jewelers Wholesale sold the jewelry to retailers is not sufficient to prove a violation of 18 U.S.C. § 1159, much less a conspiracy to violate that statute. Section 1159 is a "truth-in-advertising" statute. It does not prohibit non-Indian people from manufacturing Indian-style products or from advertising and selling those products. *See United States v. Pourhassan*, 148 F. Supp. 2d 1185, 1189 (D. Utah 2001) ("[T]he rights of manufacturers of publicly-perceived 'Indian products' are not affected by the statute since the statute only concerns the sale, not the manufacture, of goods."); *see id.* at 1194. This is so even if a member of the public might mistake the product as Indian-made. Id. What the statute prohibits is knowingly lying about the origin of non-Indian goods.

The Government strains mightily to paint all of the Defendants in this case with Raed's Golden Bear Transactions. Yet, the only connection the other Defendants have to that transaction is that the piece of jewelry sold was IJ. No witness testified regarding Imad's, Iyad's, or Nedal's knowledge about how Raed or any other retailer would present that jewelry. There are no communications among the Defendants that would illuminate the issue. And the absence of a country-of-origin stamp is not evidence of intent to misrepresent the jewelry without evidence that

7

the Defendants knew about the marking requirement. *See United States v. Sterling Islands, Inc.*, 491 F. Supp. 3d. 1010, 1020 (D.N.M. 2020) (concluding that the fact that the defendant "imported arts and crafts from the Philippines which lacked indelible country-of-origin markings does not demonstrate that [the defendant] intended to pass each such good off as genuine Native American arts and crafts.") The government has introduced no such evidence. Thus, a juror would have nothing to point to, other than the family and business relationships, to identify any conspiracy to violate the Indian Arts and Crafts Act.

Although this is a joint motion, Defendant Nedal Aysheh points out specifically that he is particularly distant from the core of sales conducted by Raed and to the manufacturing business. The Government's witnesses place Nedal in the Philippines for a brief period of time—at the latest, according to Government Witness Cherry Padica, August of 2015. Shipment records suggest an even shorter period of only about two months. The Government's case agent, Zachary Oper, testified regarding financial information showing that Nedal Aysheh only receive a single transfer of $1,500 from the business, over the course of the business' entire existence. Nedal is not an organizer of the manufacturing or the wholesale entities. He was not an officer and had no ownership stake. The Government's evidence connects him to no sales or marketing of any of the jewelry. All of the evidence leads to an abiding conclusion that Nedal was not part of any agreements to violate any laws. Evidence of guilt beyond a reasonable doubt was never adduced at trial and Nedal Aysheh is entitled to judgment of acquittal.

Similarly, Defendant Imad Aysheh points out that the government introduced no evidence that he was involved in the sale or marketing of Indian-style jewelry. At most, the government's evidence shows Imad was involved in the manufacturing of Indian-style jewelry in Gallup in the early 2000's, was familiar with the designs of artists like Calvin Begay and other Native artists,

and manufactured jewelry that was based on or inspired by those designs. The government established that the jewelry Imad made was marked only with the initials of his business, Imad's Jewelry (IJ) and the word "sterling" and not with the country-of-origin. But the government introduced zero evidence that Imad knew he was required to stamp the jewelry with the country-of-origin and zero evidence that would allow a jury to infer he knew of such a requirement. Without such knowledge, the failure to stamp the jewelry with its country of origin cannot sustain a conviction for conspiracy to violate either 18 U.S.C. § 545 or 18 U.S.C. § 1159. Thus, the government failed to introduce evidence of guilt beyond a reasonable doubt and Imad Aysheh is entitled to judgment of acquittal.      Iyad Aysheh had no input into the designs that were being manufactured.  He had no knowledge and was never made aware of any requirement that the jewelry he bought from Imad's Jewelry needed a country-of-origin stamp.  There is no evidence Iyad Aysheh misrepresented the origin or nature of the IJ jewelry he sold wholesale to any of the retailers or that he had any control over how the retailers would display or sell the jewelry. He was not an employee or owner of Golden Bear and was not involved in any sell of IJ jewelry to the public.  Given the lack of evidence of an agreement to violate the law, the lack of evidence of any misrepresentation Iyad Aysheh made and the lack of any knowledge of the importation regulation, as well as the affirmative evidence that there was no conspiracy as detailed herein, Iyad Aysheh is also entitled to a judgment of acquittal.

 As for Raed Aysheh, evidence was presented that he responded to questions posed by undercover agents of United States Fish and Wildlife Service that a reasonable jury may find to be violations of the Indian Arts and Crafts Act.  Nevertheless, just as the defendants are *not* being charged with violating customs regulations, neither Raed nor his brothers are charged with violating the Indian Arts and Crafts Act. Rather, he and his brothers are charged with *conspiring*

9

to do so. No evidence was ever presented that anyone, whether charged or not, ever told, asked, or agreed with Raed regarding how to promote, describe, advertise, display, respond to questions, or otherwise how to represent the origin or make of the imported jewelry. With respect to the failure to mark the jewelry with its country of origin, here too, no evidence was presented that Raed had any agreement with anyone regarding marking the imported jewelry or that he had any involvement in that whatever,

WHEREFORE, the Defendants move for judgment of acquittal with reference to all Defendants.

Respectfully submitted,

/s/ *Marshall J. Ray*
Marshall J. Ray
514 Marble Ave NW
Albuquerque, NM 87102
(505) 312-7598
*Counsel for Nedal Aysheh*

LAW OFFICE OF MONICA L. BARRERAS
    "Submitted electronically"

By:/s/ Monnica L. Barreras, Attorney at Law
MONNICA L. BARRERAS
P.O. Box 27158
Albuquerque, NM 87125
(505) 242-3919
monnica@barreraslaw.com
*Counsel for Iyad Aysheh*


*/s/Gregory A. Acton*
Gregory M. Acton
Acton Law Office PC
6300 Riverside Plaza Ln, NW, Suite 100
Albuquerque, NM 87120
(505) 338-0453
*Counsel for Raed Aysheh*

/s/ *Theresa M. Duncan*
Theresa M. Duncan

Law Office of Theresa M. Duncan  LLC<br>
P.O. Box 2769<br>
Santa Fe, NM 87501<br>
(505) 710-6586<br>
*Counsel for Imad Aysheh*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th Day of May 2024, a true and correct copy of the foregoing document was served electronically via electronic CMECF submission to all parties attached to the case.

/s/ Marshall J. Ray